UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:11-CR-00080-H

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| DOMINIC COOPER KING, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court on Defendant's motion to suppress [DE-27]. The Government filed a response [DE-32] in opposition to the motion. To further develop the record, the Court conducted an evidentiary hearing on March 28, 2012, at which the Government and Defendant with counsel appeared. Accordingly, the matter is now ripe for decision.

## STATEMENT OF THE CASE

On June 29, 2011, a Federal Grand Jury returned a single-count indictment against Dominic Cooper King ("Defendant"), which charged that, "[o]n or about January 31, 2011, in the Eastern District of North Carolina, the defendant, DOMINIC COOPER KING, having been convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess in and affecting commerce, a firearm, that is, a High Point, Model C9, .9mm semi-automatic handgun and ammunition, in violation of Title 18, United States Code, Sections 922(g) and 924." Indictment at 1 [DE-1].

On February 29, 2012, Defendant filed the instant motion to suppress.[1] In this motion, Defendant contends that a "show-up" identification procedure conducted by law enforcement

---

[1] Defendant's motion also included a request that the Court reopen the expired pretrial motions deadline in order to allow for the filing of the motion to suppress, which was granted by oral order of the undersigned at the March 28,

officers on January 31, 2011 was impermissibly suggestive, that the resulting identification was unreliable, and that, as a result, the out-of-court identification as well as any potential in-court identification(s) of Defendant resulting from the "show-up" should be suppressed. On March 26, 2012, the Government filed a Response [DE-32] in opposition to Defendant's motion to suppress. In its response, the Government argues that the January 31, 2011 "show-up" was not impermissibly suggestive and that the identification was reliable.

## STATEMENT OF THE FACTS

Seven witnesses, all called by the Government, testified at the evidentiary hearing on March 28, 2012 regarding a series of events that took place in Wilmington, North Carolina on January 31, 2011. The Court finds the following facts based on their testimony.

### 1. Testimony of Dane Thompson

Dane Thompson ("Mr. Thompson"), is a resident of Wilmington and was a victim in an armed robbery allegedly involving Defendant on January 31, 2011. At the relevant time, Mr. Thompson was working as a manager at a Papa John's Pizza restaurant and living at his father's house with his then-girlfriend, Ashley Brownson ("Ms. Brownson"). Mr. Thompson and Ms. Brownson were both addicted to heroin.

On January 31, 2011, Mr. Thompson got off of work between approximately 11:30 p.m. and midnight. He met up with Ms. Brownson and they arranged to meet their drug dealer in the parking lot of the Seahawk Square apartment complex in Wilmington in order to purchase heroin. Mr. Thompson drove his car, with Ms. Brownson in the passenger seat, and they arrived at the appointed location around midnight. Their drug dealer was not there, so they sat in the car to wait while talking and smoking cigarettes.

---

2012 evidentiary hearing. In addition, Defendant filed a Motion to Sequester Witnesses [DE-31], which the Court treated as a request to invoke the rule to exclude witnesses at the March 28, 2012 evidentiary hearing and which was also granted by oral order of the undersigned at that hearing.

2

While sitting in the car, Mr. Thompson saw three people standing approximately 15-20 feet away in the Seahawk Square parking lot. Mr. Thompson testified that, although it was dark, there was enough lighting in the parking lot for him to tell that it was two women and one man, all African-American and wearing dark clothing. The parties agree that the man was later determined to be Defendant and the two women were Shemekia Cooper ("Ms. Cooper") and Alicia Drayton ("Ms. Drayton"). Mr. Thompson testified that the shorter of the two women, later determined to be Ms. Drayton, walked past the car and asked them if they were "straight," ostensibly in reference to drugs, to which he responded that they were. He described Ms. Drayton as being "light complected" and testified that she was wearing baggy clothing and had a deep voice.

Approximately 1-2 minutes later, Defendant walked up to the passenger's side window of Mr. Thompson's car, which was open, and held a gun to Ms. Brownson's temple while demanding that she give him her money and her purse. At first, Ms. Brownson tried to hold onto her purse, so Defendant cocked the gun. In response, Ms. Brownson relinquished her purse, so Defendant pointed the gun at Mr. Thompson and told him to give him his wallet. Mr. Thompson didn't have his wallet on him but gave Defendant approximately $50.00 that was in the door of the car, after which Defendant walked away. Once Defendant reached the side of the nearest apartment building, he started to run, joined by the two women who had continued to stand in the parking lot during the robbery. Thereafter, all three of them ran around the building and into a wooded area directly adjacent to it.

Mr. Thompson testified that the entire robbery lasted approximately a minute and a half, that he was not previously familiar with any of the perpetrators, and that he had not been drinking or using drugs. Though Mr. Thompson was experiencing some heroin withdrawal

3

symptoms at that time, he testified on cross-examination that these symptoms did not affect his ability to see, hear, or perceive. In addition, Mr. Thompson testified that Defendant was tall and had to bend down to look into the car, that he was wearing a black hoodie and dark clothing but no mask or other face-covering, and that he appeared to have braided hair. Mr. Thompson also testified that he could tell that the gun was not a revolver but rather some type of semi-automatic handgun. Mr. Thompson did admit that he was focused more on the gun but that he looked back and forth between the gun and Defendant.

After the robbery, Ms. Brownson was very upset and told Mr. Thompson that she wanted to call the police. Though Mr. Thompson initially resisted, they quickly decided to do so. Mr. Thompson called 911 from his cell phone, while still sitting in the car. He told the 911 dispatcher about the events of the robbery, described the three people as two women and one man, all African-American and wearing dark clothing, and told the dispatcher where they had headed. On cross-examination, Mr. Thompson testified that the description he gave to the 911 dispatcher was brief because he wanted to be quick about it and thought that a limited description would suffice at that time. After hanging up, Mr. Thompson and Ms. Brownson drove over to a better-lit neighboring parking lot, associated with a Cookout restaurant, to wait for law enforcement to arrive.

When the first officers arrived, Mr. Thompson and Ms. Brownson spoke to them, both separately and together. Mr. Thompson testified that while he and Ms. Brownson were speaking to the officers, he saw the taller of the two women from the robbery, later determined to be Ms. Cooper, walking up the street in front of him. He described Ms. Cooper as having braids and wearing hemp necklaces and/or beads. He notified the officers and she was quickly detained, within what he estimated to be approximately ten minutes of the robbery. At that point, Mr.

4

Thompson gave the officers a fuller description of what had happened and more details regarding the appearance of the three perpetrators.

Subsequently, one of the officers heard over his radio that two suspects, a man and a woman, had been detained nearby. The officers told Mr. Thompson and Ms. Brownson that they wanted them to do an identification, and transported them in the backseat of a police vehicle to a location near a Burger King restaurant facing MacMillan Avenue where the two suspects were standing by another police vehicle. A spotlight was shined on the suspects and Mr. Thompson testified that he knew in "no time" that they were the man and the shorter woman from the Seahawk Square parking lot: Defendant and Ms. Drayton. He also testified that he was 100% sure then that it was them, that he was still 100% sure at the time of his testimony, and that he would have told the officers if he was not sure. Furthermore, he testified that he and Ms. Brownson did not talk about the robbery on the way to the identification, that they both positively identified the suspects at the same time while still sitting in the backseat, and that the identification happened within 20 minutes of the robbery.

Later on, Mr. Thompson and Ms. Brownson were transported back to their vehicle and, eventually, after hearing Ms. Brownson's purse had been found, went to the station to retrieve it. At that time, they each gave written statements. Mr. Thompson freely admitted that, at the time, he lied to the officers about why he had been in the Seahawk Square parking lot because he wished to cover up the fact that he was addicted to heroin. However, he also testified that, beginning shortly thereafter and continuing through his testimony at the time of the hearing, he had been entirely truthful.

5

Case 7:11-cr-00080-H   Document 36   Filed 04/27/12   Page 5 of 20

## 2. Testimony of Ashley Brownson

Ms. Brownson is a resident of Wilmington and, along with her ex-boyfriend Mr. Thompson, was a victim in an armed robbery allegedly involving Defendant on January 31, 2011. At the relevant time, Ms. Brownson was employed cleaning houses and was addicted to heroin. She testified that she had been trying to stop taking heroin and had been prescribed several prescription medications for that purpose by her doctor.

On January 31, 2011, Ms. Brownson went to work and then returned home. She testified that she had not used any heroin that day, and that her last use had been several days prior. However, she was feeling "sick" that evening from heroin withdrawal, so when Mr. Thompson got off of work, she asked him to get some heroin and he proceeded to make arrangements to meet their drug dealer at Seahawk Square. They drove to the appointed location, parked under a light so that the dealer could easily find them, and waited in the car.

While they were waiting, Ms. Brownson observed three people, two women and one man, standing in the parking lot and wearing all black. Ms. Brownson testified that, approximately five minutes after they arrived, the shorter of the two women, later determined to be Ms. Drayton, walked up to the car and asked if they were "good," to which Mr. Thompson replied that they were. Within a minute of Ms. Drayton walking by, the man, later determined to be Defendant, walked up to the open passenger's side window of the car where Ms. Brownson was sitting. Ms. Brownson testified that he was taller than the car and had to bend down to reach into it. Defendant put a gun to Ms. Brownson's head and took her purse from the floorboard. When she instinctively grabbed back, he told her that that wasn't a good idea, and she ultimately surrendered the purse. The purse contained Ms. Brownson's prescription medications, wallet,

6

and drug paraphernalia. Defendant also asked for Mr. Thompson's wallet, which he did not have with him.

Ms. Brownson testified that the entire robbery lasted approximately 3-4 minutes. She also testified that nothing was obstructing her view, that the women did not come up to the car during the robbery, that she was not previously familiar with any of the perpetrators, and that she had not been drinking or using drugs. Though Ms. Brownson was experiencing some heroin withdrawal symptoms at that time, she testified on cross-examination that these symptoms did not affect her ability to see, hear, or perceive. Ms. Brownson testified that she was focused more on Defendant than the gun, particularly when the gun was pointed at Mr. Thompson. She also testified that she was shocked, scared, and had never seen a gun before that night. She described the man as being of normal build and dark-skinned and as wearing a black hoodie and black pants. She described Ms. Drayton as being more light-skinned than Defendant and wearing a hoodie. She described Ms. Cooper as being skinny, having dreads in her hair, and wearing dark clothes.

After the robbery, Ms. Brownson saw the perpetrators run away behind a nearby building and into the woods, towards MacMillan Avenue and the Burger King restaurant. She testified that Mr. Thompson used his cell phone to call 911 and gave the dispatcher a brief description of the perpetrators as being two women and one man wearing dark clothing. Ms. Brownson did not personally talk to the 911 dispatcher. The officers arrived within approximately three minutes. Ms. Brownson testified that she remembered speaking to them even though she was "pretty upset and crying," but that Mr. Thompson did most of the talking. However, she also testified that she would have spoken up, even though she was upset, if she had believed anything he had said was wrong.

Approximately 6-7 minutes after the robbery, while talking to the officers, Ms. Brownson saw Ms. Cooper walking by. The officers detained Ms. Cooper and then transported Mr. Thompson and Ms. Brownson to MacMillan Avenue in order to have them identify two other suspects that the officers had found. The officers shined a spotlight on the two suspects and Ms. Brownson testified that, at the time, she was 100% sure that they were the other two perpetrators, Defendant and Ms. Drayton, that she was still 100% sure at the time of her testimony, and that she would have told the officers if she was not sure. Thereafter, Ms. Bronson went to the station to give a written statement.

### 3. Testimony of Officer Gary Berrio

Officer Gary Berrio ("Officer Berrio") is a patrol officer with the Wilmington Police Department ("WPD"). He has been with the WPD since 2004, and a sworn officer since 2007. On January 31, 2011, Officer Berrio was working on patrol from 6:00 p.m. until 6:00 a.m. the next morning. He heard a call come over dispatch regarding an armed robbery at Seahawk Square which stated that the victims were waiting in the Cookout parking lot.

According to Officer Berrio's Computer Aided Dispatch ("CAD") report, he arrived at the Cookout parking lot at 12:40:29 a.m., where he encountered the victims, Mr. Thompson and Ms. Brownson. He testified that they appeared very panicked, particularly Ms. Brownson. He spoke to them briefly, but almost immediately they pointed out a woman walking up the street as one of the perpetrators of the robbery, later determined to be Ms. Cooper. Officer Berrio detained Ms. Cooper at 12:41:29 a.m., and stayed with her until another unit arrived. Thereafter, another officer stayed with Ms. Cooper, additional units set up a perimeter, and Officer Berrio resumed speaking to Mr. Thompson and Ms. Brownson.

Mr. Thompson gave Officer Berrio the basic details of the robbery, described the man as being a heavyset black male wearing a black hoodie and black gloves, and Officer Berrio sent out that description at 12:46:55 a.m. via radio. He testified that his role in the investigation was to "get the basics" and that he knew a detective would gather further details at a later point. Thereafter, Officer Berrio heard over his radio that another unit had found two suspects, so he transported Mr. Thompson and Ms. Brownson to that location at 12:55:34 a.m..

En route, Officer Berrio told Mr. Thompson and Ms. Brownson only that two suspects had been found who matched their description and that he was going to ask them to "say 100% yes or no" whether they were the other two perpetrators. On cross-examination, Officer Berrio also indicated that he had told them that the suspects might not be the other two perpetrators. Upon arriving, Officer Berrio shined a spotlight on the suspects, who were standing on the corner and not handcuffed. Officer Berrio testified that both Mr. Thompson and Ms. Brownson immediately positively identified the suspects as the other two perpetrators, later determined to be Defendant and Ms. Drayton, and indicated that they were 100% sure.

Officer Berrio informed the other officers at the scene that the identification had been positive and transported Mr. Thompson and Ms. Brownson back to their car in the Cookout parking lot. He drove to the WPD station while Mr. Thompson and Ms. Brownson followed in their own vehicle. While there, he sat with Mr. Thompson and Ms. Brownson in the lobby before going down to the holding cell where the three suspects had been taken. In the holding cell, he observed a blue mesh bag containing a pill bottle with Ms. Brownson's name on it that had been retrieved from Defendant. On cross-examination, he admitted that he had not mentioned the pill bottle in his police report, but that he had remembered it later.

### 4. Testimony of Shemekia Cooper

Ms. Cooper has been a resident of Wilmington on and off for her whole life. On January 31, 2011, she was at Seahawk Square with Defendant and Ms. Drayton "getting to know" them because, though they were both her cousins, she had only met them a few months before. At approximately noon, the three had met at Seahawk Square and spent some time in an apartment in the complex which belonged to Ms. Drayton's sister. At some point, the three left the apartment, and when they returned the door was locked, so they stood around outside.

While standing in the parking lot, a car pulled up with two people in it and parked under a lamppost, approximately 20-30 feet away from where they were standing. Ms. Cooper testified that Ms. Drayton walked over to the car when the occupants "called her over." Ms. Cooper also testified that, shortly after Ms. Drayton returned, the occupants of the car "called [Defendant] over." Thereafter, Ms. Cooper heard a commotion and some yelling, though she could not hear what was said, and testified that Defendant appeared to be robbing the occupants of the car. She also testified that she had not seen Defendant with a gun prior to the incident and that the apparent robbery lasted only a few seconds.

After the robbery, Ms. Cooper testified that Defendant ran past her and Ms. Drayton and that she followed to tell Ms. Drayton not to run because she hadn't done anything wrong. Ms. Cooper saw that Defendant was carrying a purse but could not see a gun. The three split up, each turning off at different times, and Ms. Cooper ended up in the Cookout parking lot to retrieve her car, where she was ultimately detained.

### 5. Testimony of Alicia Drayton

Ms. Drayton has been a resident of Wilmington for her whole life. She knows Ms. Cooper as her cousin and Defendant as her uncle. On January 31, 2011, Ms. Drayton was

visiting her sister's apartment in Seahawk Square with Defendant and Ms. Cooper. At some point, the three left the apartment, and when they returned the door was locked so they stood around outside.

At first, the three were the only people in the parking lot. However, at some point, a car pulled up and parked in front of Ms. Drayton's sister's building. Ms. Drayton could see that the occupants of the car were a man and a woman and that they were white. Ms. Drayton testified that the couple rolled down their window and asked her if she had "any bags," ostensibly in reference to drugs. Ms. Drayton testified that she answered, without moving, that she did not, and then turned around and resumed her conversation with Ms. Cooper and Defendant. Ms. Drayton testified that she did not remember seeing Defendant with a gun, that she heard the man in the vehicle say he did not have any money and that she thought there was a robbery occurring, and that she turned and ran behind the buildings because she was scared of what was going on. Subsequently, she saw Defendant with a purse and heard sirens.

When the officers arrived, Ms. Drayton was with Defendant at the corner of MacMillan Avenue and Ms. Cooper was already gone. Ms. Drayton testified that, though she had not seen Defendant with a gun earlier in the evening, she saw him throw a gun into a ditch before the officers searched them. She also testified that Defendant told her to tell the officers that Travis King had done the robbery. On cross-examination, Ms. Drayton testified that she did not know who Travis King was. Subsequently, Ms. Drayton testified that she was detained, put in handcuffs, and taken to a different location with Defendant, where a bright light was shined on them as they stood by a police vehicle. Thereafter, Ms. Drayton testified that she was taken to the WPD station and charged with conspiracy to commit armed robbery, a charge which was still pending at the time of the hearing.

### 6. Testimony of Officer Milton McLamb

Officer Milton McLamb ("Officer McLamb") is a patrol officer with the University of North Carolina at Wilmington's Police Department ("UNC-W PD"). He has been with the UNC-W PD for a year and a half. On January 31, 2011, Officer McLamb, along with two other officers, was patrolling the UNC-W campus from 7:00 p.m. until 7:00 a.m. the next morning. At 12:37 am, he heard a call come over dispatch regarding a robbery in the area which described three suspects as two women and one man, all African-American and wearing dark clothing, and armed with a gun. He headed towards the scene described by dispatch and saw a man and two women crossing a ditch. One of the women, later determined to be Ms. Cooper, went back into the woods but Officer McLamb was able to detain the other two, later determined to be Defendant and Ms. Drayton. He testified that Defendant was wearing a dark hoodie and that Ms. Drayton was also wearing dark clothing.

Officer McLamb notified dispatch that he had detained two suspects and stayed with them until WPD officers arrived approximately 30 seconds later. Officer McLamb testified that he did not search Defendant but that he saw a WPD officer do so and pull a blue bag out of the front pouch of his hoodie. Officer McLamb also testified that he told the WPD officers where he had seen the suspects come from and that, while still on the scene, he saw one of the WPD officers find a gun. However, Officer McLamb was not present for the "show-up" and did not prepare a police report in conjunction with the incident.

### 7. Officer Eric Lippert

Officer Eric Lippert ("Officer Lippert") is a patrol officer with the WPD. He has been with the WPD for approximately five years in this position. On January 31, 2011, Officer Lippert was working on patrol from 6:00 p.m. until 6:00 a.m. the next morning. At 12:33 am, he

heard a call identified as high priority come over dispatch regarding a robbery near the Cookout restaurant involving an African-American male wearing a hoodie and gloves and accompanied by two women. Officer Lippert testified that he typically waits for the first responder to this type of dispatch call to provide more information. Therefore, once he heard that Officer McLamb had detained two suspects, he headed to that location instead of participating in setting up a perimeter.

When he arrived, accompanied by another officer, Officer McLamb was parked on MacMillan Avenue and was standing next to an African-American man and woman. Officer Lippert also testified that, because he was aware that a purse was missing and that suspects often threw away potential evidence, he proceeded to search the woods that Officer McLamb had described the suspects as coming from as well as a nearby ditch running along MacMillan Avenue. As a result, in the ditch, Officer Lippert saw a black handgun. Without indicating that he had seen it, he walked over to Defendant, handcuffed him, and conducted a pat-down for officer safety, during which he found a blue bag. Officer Lippert testified that he removed the handcuffs before the "show-up" and that he did not conduct a proper search of Defendant until after he had been positively identified in the "show-up." In addition, Officer Lippert testified that Defendant was wearing a baggy black hoodie and was taller than himself. Subsequently, Officer Lippert transported Defendant to the WPD station.

On cross-examination, Officer Lippert testified that the "show-up" he conducted in this case was within 30 minutes and in the same general area as the robbery and that it was chosen as the most effective method of identification. He testified that it was standard WPD practice to bring the victims to the suspects rather than to bring the suspects to the victims or transport the suspects to the station. In addition, he testified that he did not take the suspects to the station to

conduct a line-up because WPD patrol officers do not typically conduct such procedures, that he had never done a line-up and that, as far as he knew, though WPD detectives did do line-ups, they only did photo line-ups.

## DISCUSSION

When an identification procedure is challenged in a motion to suppress, courts undertake a two-step analysis in order to determine the admissibility of the resulting identification. First, the challenger must "prove that the identification procedure was impermissibly suggestive." *Holdren v. Legursky*, 16 F.3d 57, 61 (4th Cir. 1994) (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). Second, "[o]nce this threshold is crossed, the court then must determine whether the identification was nevertheless reliable under the totality of the circumstances." *Id.* If an identification procedure is impermissibly suggestive or the resulting identification is unreliable, the resulting identification must be suppressed.

Here, Defendant contends both that the January 31, 2011 "show-up" identification procedure conducted by law enforcement officers was impermissibly suggestive and that the resulting identification was unreliable and that, therefore, the out-of-court identification as well as any potential in-court identification(s) of Defendant resulting from the "show-up" should be suppressed. In response, the Government argues that the January 31, 2011 "show-up" was not impermissibly suggestive and that the identification was reliable. Accordingly, the Court will address each of these two components in turn.

### 1. Defendant's argument that the "show-up" was impermissibly suggestive

"A[n] [identification] procedure is unnecessarily suggestive if a positive identification is likely to result from factors other than the witness's own recollection of the crime." *United States v. Porter*, No. 08-4437, 2009 WL 2158098, at *4 (4th Cir. Jul. 21, 2009) (quoting *Satcher*

14

Case 7:11-cr-00080-H Document 36 Filed 04/27/12 Page 14 of 20

v. *Pruett*, 126 F.3d 561, 566 (4th Cir. 1997)). However, "while arrest scene show-ups may under some circumstances be suggestive, prompt show-ups are not per se suggestive and may in fact 'promote fairness, by enhancing reliability of the identifications, and permit expeditious release of innocent subjects.'" *United States v. Wilson*, No. 06-4255, 2006 WL 3780623, at *2 (4th Cir. Dec. 20, 2006) (citing *Willis v. Garrison*, 624 F.2d 491, 494 (4th Cir. 1980)) (internal citation omitted).

Here, Defendant argues that the "show-up" was impermissibly suggestive because (1) he was the only African-American male shown to the victims; (2) the victims were allowed to "make identifications while exposed to suggestive influences from the other," Mot. to Suppress at 4 [DE-27]; and (3) Defendant could have been taken to the WPD station for a less suggestive procedure, such as a line-up. In response, the Government concedes that the "show-up" was somewhat suggestive because all "show-ups" are by their very nature suggestive, but that this one was not impermissibly so. In support of its position, the Government points to the fact that Defendant was detained within 7-9 minutes of the 911 dispatch call and the "show-up" took place within 30 minutes of the robbery. In addition, the Government contends that the officers had a legitimate reason not to take Defendant to the station in order to employ a less suggestive identification procedure—namely, it was imperative to know as soon as possible whether they had detained the correct individuals because if they had not, the search would need to be continued and the time spent taking Defendant to the station could have caused irreparable harm to the investigation.

With regard to Defendant's arguments, the Court finds the following: First, "show-ups," by definition, involve showing only one suspect (or, as in this case, one set of related suspects) to the victim(s) of a crime and, therefore, the fact that Defendant was the only African-American

15

male shown to the victims of a crime which they had described as having been committed by one African-American male is inapposite. Second, both victims have testified that they did not discuss the robbery or Defendant with each other while they were being transported to the location where the "show-up" took place and the Court finds that any "suggestive influences" were thus not impermissible. Finally, the Government has not only provided a legitimate reason for not transporting Defendant to the WPD station for a line-up—the preservation of the investigation—but has offered the testimony of Officer Lippert to demonstrate that such an action would not have been part of the WPD's general practice in any case. Furthermore, the Court notes that the suggestiveness of the "show-up" is further reduced by the close temporal proximity of the "show-up" to the robbery. *See, e.g., Porter*, 2009 WL 2158098, at *5 ("[W]hen one-man confrontations occur *promptly after the commission of a crime*, the police have obtained a good description of the offender, and the show-up is completed under circumstances where it is important to continue the search for the real culprit promptly if he has not been apprehended, they are likely not suggestive." ) (citations omitted) (emphasis added).

As a result of all of the foregoing circumstances, the Court finds that the "show-up" in question was not impermissibly suggestive. However, in the interest of completeness, the Court will assume, *arguendo*, that the "show-up" *was* impermissibly suggestive and proceed to address Defendant's argument that the resulting identification was unreliable.

**2. Defendant's argument that the identification was unreliable**

In determining whether an identification was reliable under the totality of the circumstances, courts consider five factors: the opportunity of the witness to view the suspect at the time of the crime, the witness' degree of attention to the suspect, the accuracy of the witness' prior description of the suspect, the level of certainty demonstrated at the time of the

identification, and the time elapsed between the crime and the identification. *Wilson*, 2006 WL 3780623, at *2 (citing *Brathwaite*, 432 U.S. at 114); *see also Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

Here, Defendant argues that the identification was unreliable under the totality of the circumstances because (1) the victims' descriptions to 911 were vague and no detailed description of Defendant was given prior to the "show-up" beyond his race; (2) the victims' opportunity to observe Defendant was insufficient because it was nighttime and both of the victims were focused on the gun and not Defendant; and (3) the victims remained together, were interviewed together, and were transported together to the "show-up," creating a risk that they would influence each other's recollection of the facts. In response, the Government argues that the victims had ample time to view Defendant before and during the robbery, that they saw Defendant up close and under a light while he had nothing covering his face, that the descriptions both of the victims gave were accurate, that they identified Defendant immediately as being one of the perpetrators and were 100% certain about their identification, and that the identification occurred within 20-25 minutes of the 911 call. In addition, the Government notes that both the statements of Ms. Cooper and Ms. Drayton as well as the items retrieved from Defendant, the pill bottle and the gun, implicate Defendant in the robbery. Finally, the Government contends that the identification should not be suppressed because even if is allowed, Defendant will still have an opportunity to cross-examine the Government's witnesses to assess their credibility at trial.

With regard to Defendant's arguments, the Court finds the following: First, though Defendant is correct that the victims gave more detailed descriptions at the hearing than on the night of the robbery, the Court notes that the descriptions given that night were neither factually

incorrect nor not in conformity with the suspects presented by the officers and that Mr. Thompson testified that he was brief in the interest of efficiency. Second, the Court notes that both victims testified that there was sufficient lighting in the parking lot for them to have a clear view of the perpetrators and that, though Mr. Thompson admitted he might have focused more on the gun, Ms. Brownson indicated that she focused more on Defendant and both victims indicated that they had ample opportunity to view Defendant. Finally, as discussed in section 1, *supra*, the Court notes that both victims have testified that they did not discuss the robbery or Defendant with each other while they were being transported to the location where the "show-up" took place.

Furthermore, in reviewing the five factors courts are to consider—the opportunity of the witness to view the suspect at the time of the crime, the witness' degree of attention to the suspect, the accuracy of the witness' prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the time elapsed between the crime and the identification—the Court finds no cause for concern as to the reliability of Mr. Thompson and Ms. Brownson's identifications of Defendant. In substantially similar circumstances, the Fourth Circuit has found "show-up" identifications to be reliable. *See, e.g., United States v. McFadden*, No. 05-4366, 2006 WL 1817620, at *3 (4th Cir. Jun. 28, 2006) (concluding that "show-up" identifications were sufficiently reliable because the two victims "had an ample opportunity to view [the defendant] in possession of the handgun in well-lit areas during their respective interactions with him[,]" both identified the defendant within fifteen minutes, provided descriptions of the defendant which were consistent with each other and with the evidence, and "were definitive in their pre-trial identifications"). In particular, the Court finds noteworthy the fact that Defendant was located, detained, and presented to the victims for identification within

30 minutes of the time they were robbed at gunpoint, as well as the fact that both victims testified that they were 100% certain that Defendant was the perpetrator at the time of the identification and at the time of the hearing. In addition, the Court notes that, at the hearing, though there were a handful of discrepancies between their testimony and the testimony of Ms. Cooper and Ms. Drayton, Mr. Thompson and Ms. Brownson were candid and credible, describing substantially the same circumstances surrounding the robbery and giving substantially the same descriptions of the three perpetrators.

Accordingly, as a result of all of the foregoing circumstances, the Court finds that, even assuming, *arguendo*, that the "show-up" in question was impermissibly suggestive, the "show-up" was nonetheless reliable.

In sum, the Court finds that the "show-up" identification procedure was not impermissibly suggestive. Furthermore, the Court finds that, even assuming, *arguendo*, that the "show-up" was impermissibly suggestive, the identification was nevertheless reliable under the totality of the circumstances. Accordingly, finding no merit in Defendant's contentions to the contrary, it is recommended that Defendant's motion to suppress be denied.

## CONCLUSION

The Court **RECOMMENDS** that Defendant's Motion to Suppress [DE-27] be **DENIED**. The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds

of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This the 27th day of April, 2012.

DAVID W. DANIEL
United States Magistrate Judge